BUERHAUS v. DeSAUSSURE.

1. SETTLEMENT OF ESTATE—SCOPE OF ACTION.—A complaint filed by the administratrix *de bonis non, cum testamento annexo*, of a solvent estate, for the aid of the court in obtaining an accounting by the deceased executors and by the legatees, so that the plaintiff might ascertain what was due, is not a bill to marshal assets, and does not require the surrender of the estate to the court for administration.

2. LEGATEES—PAYMENT OF SHARES—INTEREST.—After the payment of all debts and pecuniary legacies, the funds are divisible *pro rata* among the residuary legatees, and they, being all *sui juris*, cannot be required to account for interest on payments made to them not in excess of their

shares, although these payments were severally received at different times and in unequal amounts. For any excess, they must account with interest, and refund to the other legatees, all of them being parties to the cause.

3. MATTER UNDER REFERENCE—APPEAL.—A matter referred back to the master for investigation will not be considered on appeal.

4. FINDINGS OF FACT by the Circuit Judge sustained, they not being without evidence to support them, nor manifestly opposed to its weight.

5. ACCOUNT BY EXECUTORS—PROOF—INDULGENCE.—An itemized account of the administration of an estate, filed by the representative of the last survivor of four executors and of another of these executors, is *prima facie* evidence of the correctness of the charges, but not of the disbursements credited; but proof must be made by vouchers or other proper evidence. Under the circumstances of this case, and after a great lapse of time, every reasonable indulgence ordered to be granted in taking the account.

6. WILL—POWER—COMPROMISES.—A testator empowered his executors "to compound for, compromise, and settle such debts as are due to me upon the terms which, in their judgment, may be best for the interest of my estate." The executors, with no improper motive, permitted interest to accumulate for several years on certain debts due to testator, that were well secured, and then compromised them, including bonds due by the church of which deceased was a member. *Held*, that the executors were chargeable with the losses resulting from these compromises.

7. EXECUTOR—AGENT FOR LEGATEES.—The evidence does not show that one of the executors, who made these compromises, had full power to represent the legatees, and, therefore, that they were estopped from now objecting; especially as the compromises were made in the absence of such executor.

8. MATTER REFERRED BACK.—Objection to a mere matter of book-keeping not considered, where the account has to be restated by the master.

9. EXECUTORS—COMMISSIONS.—Where executors sell land subject to a mortgage, which the grantee assumed, they are entitled to commissions only on the purchase money in excess of the mortgage, as that is all that passes through their hands.

10. IBID.—ACCOUNTS.— Where a legatee received bonds with past due coupons attached, she should be charged, and the executors credited, with the value of these coupons.

11. SEVERAL EXECUTORS—DEVASTAVIT.—One of the executors who took part in the management of the estate, is responsible for a *devastavit*, committed during his lifetime, in the failure to collect good assets.

12. EXECUTORS—RENTS.—Executors are not chargeable with the rent of houses, where the evidence does not show any default on their part.

13. IBID.—ACCOUNTS—INTEREST.—The accounts of an executor should be stated with annual rests, but interest is not to be compounded. It is better to keep the interest in a separate column.

14. IBID.—IBID.—IBID.—Executors are chargeable with interest on negotiable bonds sold by them in the absence of evidence to show that past due coupons were attached.

15. GENERAL EXCEPTIONS not considered.

16. EXECUTOR AND LEGATEE—DEVASTAVIT—RETAINER.— The administrator of a deceased executor, who was also residuary legatee, should not receive any portion of this share until a devastavit, for which the deceased executor was responsible, is made good, it not appearing that he owed other debts.

17. SPECULATIVE INQUIRY.—A question rendered speculative by the decision of other issues in the cause, not considered.

18. DISTRIBUTION—LIFE INTERESTS.—*It would seem* that in stating an account for the distribution of an estate, funds held for the lifetime of a beneficiary under the will, and to raise an annuity as directed, should not be brought into the account with the residuary legatees while these beneficiaries are living.

19. AN EXCEPTION based upon a misconception, overruled.

20. PETITION FOR REHEARING refused.

Before HUDSON, J., Charleston, August, 1892.

Action by Marie L. Buerhaus, as administratrix *de bonis non, cum testamento annexo,* of Etienne Poincignon, deceased, and upon the death of plaintiff, pending action, continued in the name of Caroline McNulty, as successor in the same office, against Martha G. DeSaussure, as executrix, and others. The master's report was as follows:

This case was referred to me by an order of the court, filed April 9th, 1888, to take the testimony, hear and determine all the issues made by the pleadings, with leave to report any special matter. I have held references, have taken the testimony which is herewith filed, and have heard argument upon the issues presented.

I respectfully report: That the complaint in this case is brought by Marie L. Buerhaus, to whom, after the death of the last surviving executor of the late Etienne Poincignon, letters of administration *de bonis non, cum testamento annexo,* upon the estate of the said E. Poincignon, were granted against the executrix of the last executor, the residuary legatees under the will, and other devisees or their representatives, setting forth the fact that Wilmot G. DeSaussure, the last surviving execu-

tor, died without having fully administered the estate; that all
the debts and pecuniary legacies have been paid; but there
still remains, unadministered, considerable personal property,
to which the residuary legatees and devisees, or their represen-
tatives, are entitled.   That no satisfactory accounts have been
filed by the executors named in the will, and that, on account
of various matters referred to in the complaint, the plaintiff
cannot safely proceed in the appropriation and distribution of
the assets that have come into her hands.   In order, therefore,
that all matters of doubt and uncertainty may be removed as
to what she should do in finally winding up and settling the
estate, giving to all parties who are, or claim to be, interested
therein that to which they may be respectively entitled, plain-
tiff prays judgment that the defendant, Martha G. DeSaussure,
executrix of Wilmot G. DeSaussure, may be required to ac-
count for the assets of the estate of E. Poincignon, which came
into the hands of the said W. G. DeSaussure, as executrix as
aforesaid; that administration *de bonis non* may be had upon
the estates of the deceased legatees, and the said personal rep-
resentatives may be made parties hereto, and that the defend-
ants, who are residuary legatees, &c., may be required to
answer the complaint, and in their several answers to severally
and distinctly set forth the nature and extent of what they re-
spectively claim to be entitled to receive from and out of the
assets and securities which have or may come into plaintiff's
hands, as administratrix aforesaid.

All the defendants answered.   The residuary legatees joined
in the prayer of the complaint, and asked for an accounting by
the executrix of W. G. DeSaussure, "and that such of the re-
siduary legatees now living, and the personal representatives of
such of them as are deceased, do respectively account for the
amounts received by each of the said legatees on account of his
or her share in said residuary estate, and that the assets now
in the hands of the plaintiff herein, may be apportioned and
distributed among the residuary legatees, or their personal
representatives, according to their respective rights and inter-
ests in the same."

During the progress of the cause Miss M. L. Buerhaus, the

plaintiff, died, and letters of administration *de bonis non, cum testamento annexo*, upon the estate of E. Poincignon, having been thereupon granted by the Probate Court to Mrs. Caroline Mc-Nulty, an order was passed substituting her as plaintiff herein, in the room of Marie L. Buerhaus, deceased, and also making the executors of said Marie L. Buerhaus parties defendant hereto.

I hold, as matter of law, that this is a complaint for the general winding up and administration of the estate of E. Poincignon in this court, involving an accounting both by the representative of the last surviving executor and by and between the residuary legatees, so that it may be ascertained what assets remained unadministered, what is due by the executors to the estate, or *vice versa*, what payments have been made on account of the residuary estate, and whether anything is due by the estate to residuary legatees, or by them, or any of them, to the estate, so that a final settlement may be made between all the parties to the suit, and the rights of the parties fixed by a final decree. This view of the case was taken and acquiesced in by all the parties to the cause through their attorneys, and the testimony was directed to these ends. Miss Jugnot and Mrs. McNulty, two of the residuary legatees, were represented by the same attorneys who filed the complaint, and who continued so to represent them through Mr. Ficken, the surviving partner of Hayne & Ficken, until near the end of the references, when some conflict of interest between Miss Jugnot and Mrs. McNulty having been developed, Mr. Ficken withdrew from representing Miss Jugnot, and Mr. C. B. Northrop was substituted as her attorney.

Mr. Northrop at once vigorously contended that the scope of the complaint is simply for an accounting by the representative of the last executor and administration of the unadministered assets, and that a residuary legatee who might be shown by said accounting to have been overpaid, cannot be made to refund in these proceedings. I cannot concur in this view. The account to be taken must necessarily show what payments have been made to the residuary legatees, in order to ascertain what amount, if any, is still due to them or any of them. If such accounting shall show that any one residuary legatee has been

overpaid, I can see no good reason why, under such a proceedings as this, such legatee should not be required to refund to the residuary estate such excess, in order that an adjustment of the accounts between them may be made and a multiplicity of suits avoided. The residuary legatees must be regarded as quasi distributees, and the payments made to them as advances on account of their distributive shares. If there was originally a sufficiency of assets, and said assets have since been wasted by the executors, then it would seem that such refunding will not be ordered; but if, taking the whole estate together, it shall appear upon the final accounting that there was an original deficiency of assets, the rule is different. I hold, as a matter of law in this case, that under the pleadings and proof herein, it is competent for the court to order a refunding by any residuary legatee who may have been overpaid, in order that a complete settlement and distribution of the estate may be made.

With this preliminary ruling, which it was necessary to make here in order to fix the principles of the accounting, I proceed to state and determine the questions presented upon the account itself. I find the following facts: Mr. E. Poincignon died in July, 1873, leaving a large and valuable estate. He left a will, giving various large legacies, and created various estates in trust for several nephews and nieces for life, with remainder over to their children, or such person as the life tenants should appoint by will, and the residue of his estate to six nieces and nephews; it also being provided that the trust estates should fall into the residuary upon failure of children or testamentary disposition. Four executors—Trouche, Downey, Duval, and DeSaussure—were appointed by the will. All qualified. The inventory of the estate was duly filed, and the executors filed an account in the Probate Court in November, 1874, showing payments of all debts and absolute legacies, and that the annuities and trust estates had been provided for, and that only the residuary estate remained to be settled, some payments having been made on account thereof. The account showed a balance in the hands of the executors of $1,089.64. No other account was ever filed by the executors. Trouche died in 1877, Duval in 1878, and from the latter date until his departure from Char-

leston in 1882, the managing executor of the estate was Downey. He had the custody of the assets, collected through his agents the rents of the estate, and conducted all its affairs. He was also the trustee and agent of Miss Buerhaus and Miss Jugnot, and attended to the business affairs of Mrs. McNulty. He was the trustee and afterwards the executor of Mrs. E. C. Downey, and guardian of her children. All the parties had entire confidence in him, and his trustworthiness has not been impugned. Downey removed from Charleston to New York in 1882, and died there in April, 1883, without having returned to Charleston. After his departure the estate was managed by Gen. W. G. DeSaussure, the last surviving executor, until his death on February 1st, 1886. The account now filed by the defendant, Martha G. DeSaussure, executor of Wilmot G. DeSaussure, has been made up with the utmost care and fullness from all the materials at her disposal, consisting of the check books and memoranda left by Downey and DeSaussure, and includes not only an account of the assets turned over by Downey to DeSaussure, but also an account made out as fully as possible from the papers left by Downey of all receipts and payments from the date of the account filed by the executors in 1874, down to the period of turning over of the unadministered assets of M. L. Buerhaus, administratrix. An immense amount of labor has been expended by the representatives of Mrs. DeSaussure in constructing this account, and great credit is due them for the measure of success attained.

In dealing with the account, I have followed the rule laid down in the case of *Duncan, ex'or,* v. *Tobin,* Cheves Eq., 146, in these words: "According to the practice of the English courts, all parties accounting before the master are required to bring in their accounts in the form of debtor and creditor, accompanied by an affidavit containing a verification of the accuracy of the schedules in which are contained the details of the account, and if any of the parties are dissatisfied with it, they may examine the accounting party on interrogatories. If the party asking the account sets up a charge not admitted in the account, nor on the examination of the accounting party, he must substantiate it by evidence; when that is done, either by

admission or proof, the accounting party must discharge himself by the production of receipts, or other competent evidence.''

The account, as presented, has been rigorously scrutinized and vigorously attacked. Various objections to different items have been made from time to time. The following schedule contains, I think, a list of the objections which have been pressed in argument. [Schedule omitted, as it is repeated below, but from such repetition, items passed upon and not excepted to are omitted, as they pass out of the case.]

1. With regard to the loss by compromises, it is sufficient to say that by the terms of the will the executors were vested with full power and authority ''to compound for, compromise, and settle such debts as are due to'' testator ''upon the terms which, in their judgment, may be best for the interest of my estate, with leave and authority to purchase for my estate any part of the real property mortgaged to me, if in their judgment such purchase becomes necessary to save my estate from serious loss.'' Equity will not interfere with a discretionary power of compromise such as this, except where fraud is shown. *Fronty v. Fronty*, Bailey Eq., 521–2. See, also, *Nichols v. Eaton*, 91 U. S., 724, 725; *Olcott v. Bynum*, 17 Wall., 63; *Markey v. Langley*, 92 U. S., 154; 2 Perry on Trusts (edit. 1882), § 511, p. 36. In the condition of real estate in Charleston during the period when these compromises were effected, it may well be doubted whether more could have been gotten out of the property than was actually secured. Some of the debts were settled by purchase under foreclosure, or by release of the equity of redemption—acts strictly within the power conferred by the will. Others were what are known as ''the bishop's bonds.'' These bonds were secured by mortgages of the property of the Roman Catholic Church; one mortgave covered the cemetery in which testator was buried, others the bishop's residence in Charleston, and the convent buildings in Columbia. I cannot think that the court will disturb these compromises. There is no evidence of fraud or collusion, and I am greatly inclined to think that, under all the circumstances of the case, the executors made the best practicable settlement. The first objection must, there-

fore, be overruled, and the same ruling will apply to the omission to collect interest on personal bonds, as a part of the exercise of the same discretionary power. * * *

8. Charge to Mrs. McNulty (November, 1874,) of $3,579.67. The evidence shows that this item should be stricken out from both sides of the account, and with this modification the objection of this item is sustained.

9. Charge to Mrs. McNulty, Miss Buerhaus, Miss Jugnot, and Mrs. Duval each of $175, on November 15th, 1881. Upon this point the evidence shows that Mr. Downey, who was the trusted agent of these ladies, received this money on their account and paid it over on their behalf to John Barbot. Their testimony does not really contradict this, and upon a review of all the evidence upon the point I think the charge should be allowed, and the objection is, therefore, overruled.

10. Payment to Mrs. Downey, guardian, of $1,776.16. Upon this point the testimony shows that Gen. DeSaussure held two funds out of which payments were to be made to the Downey children—1st, the fund arising from the rents of the Waverly House, and 2d, the general fund of the estate of Poincignon. These funds were incorporated together by him, and there is no doubt that the vouchers for the payment, aggregating the amount of $1,776.16 profess to be for payments on account of the residuary estate. But a careful review of the evidence satisfies me that these payments were really made from the Waverly House rents, and should have been charged against that account, and are not proper charges against the residuary estate. I must, therefore, sustain this objection, and hold that this item should be disallowed and stricken from the account.

*        *        *

13. Allotment of Manning bond to estate of Julius Trouche. In the items of amounts admitted as received for estate of Julius Trouche, there will be found five items, aggregating the sum of $3,476.16, the amount of the Manning bond; and on the stub of the checks by which these payments were made appear the declaration that they were on behalf of Trouche's estate. And it further appears to my satisfaction that these payments were invested in the Manning bond on behalf of the

estate of Trouche, and that said estate is the equitable owner of the said bond. I hold, therefore, that this objection should be overruled, and the Manning bond be decreed to be the property of the estate of Julius Trouche.

14. Charge by the executors of commissions on $16,000, purchase money of 285 King street, sold to Mrs. McNulty, instead of on $6,746.33, the actual cash received by the executors. The objection to this charge seems to be unfounded. Mrs. McNulty paid for property—worth $16,000—$6,746.33 in cash, and assumed the payment of the mortgage thereon, $9,253.67. If the executors had sold the property to a stranger for $16,000 and paid off the mortgage from the proceeds of sale, the transaction would have been substantially the same, and the commissions would have undoubtedly attached. I see no reason for depriving them of the commission because they adopted the shorter method with one of the legatees under the will. This objection is, therefore, overruled. So, also, with regard to objection 16, as to charge of commissions on net rents collected and paid out. It was, of course, necessary to ,employ agents to collect the rents of the real estate, and the amounts paid over by them to the executors were, of course, exclusive of the compensation allowed such collectors for their services. This was a necessary expense, and I do not see that it would be just to charge the executors with it. In the absence of any direct authority upon the point—and my attention has not been called to any—I hold that this objection must be overruled, and the commissions upon the net rents allowed.

15. Item of cash noted in inventory, not accounted for, $155. The cash called for in the inventory was made up of various deposits in different banks, aggregating $44,525.94, to which was added as cash note of F. T. Downey (as per pencil memorandum in inventory) for $260, making amount called for in inventory $44,785.94. The Downey note was really for $250, and not for $260, as will be seen by the note in evidence, and the note was subsequently paid.

16. Charge to Mrs. McNulty of $405, interest on $3,000 State of S. C. bonds turned over to her. It appears from the evidence, that from time to time various amounts of State S.

C. bonds, with coupons for various amounts attached, were turned over to the several residuary legatees. The bonds turned over to Mrs. McNulty on April 17th, 1879, had coupons attached from July 1st, 1877, amounting to $405. I can see no reason why she should not be charged with this interest which she received. The same charge was made against the other residuary legatees, though for smaller amounts, as they received their bonds at an earlier date, and has been acquiesced in. I think this objection should be overruled.

18. Notes of E. H. Stelling, A. Loryea, and James Salvo, jr., not collected. The first of these notes was for $300, the others for $100 each. They were turned over to the administratrix *de bonis non* as worthless. I think the executors are entitled to the benefit of the doubt, as to whether those debts could have been collected. There is no evidence showing that the parties were able to pay, and, under all the circumstances, I hold that this objection should be overruled. * * *

21. Responsibility of estate of Julius Trouche for *devastavit* charged. In the view that I have taken of the case, and of the compromises made by the executors, no *devastavit* as charged has been committed, and this objection must be overruled.

22. Rents "evidently collected by the executors," but omitted from account. This objection proceeds on the presumption that wherever any real estate remained in the hands of the executors, it must have been rented and the rents collected. But this is hardly a tenable position. Distress for rent was abolished in 1868, and was not fully restored until 1878 (16 Stat., 265 and 511). It would be unjust to hold the executors responsible for rents that should have been realized during this period; and I do not think the evidence establishes any actual receipt that has not been accounted for. This objection is overruled.

23. Account should be stated with annual rests. While this is undoubtedly the general rule, I do not think it possible to apply it under the peculiar circumstances of this case. As will be seen, the account here has been made up with infinite care and trouble from all available memoranda, and I think with every desire to do complete justice. I do not think that equity

will insist upon the rigid application of the rule to an account of this character. And the objection is overruled. * * *

26. Failure to enter January, 1881, interest on $4,000 city bonds. These bonds seem to have been taken at a valuation which probably included the coupons; and, at all events, the evidence does not seem to me sufficient to sustain the objection, which is, therefore, overruled.

27. Charge by executors of commissions on cash paid over by them to administratrix *de bonis non.* The question of commissions is a troublesome one, and I do not know of any direct authority upon this point. In the absence of such, I hold that the terms of the act are broad enough to cover this case, and the commissions should be allowed.

I have thus gone over and passed upon all the objections that have been seriously pressed against the account. It will now be necessary to restate the account, according to the rulings that I have made upon the various points presented. The papers marked 1 and 2 show this restatement in detail. The final result thereof is to leave a balance in favor of the executors of $1,095.80. The account with the residuary estate shows unequal payments to the various residuary legatees, and the question arises, how the legatees who have been underpaid are to be equalized with the others? Holding, as I do, that the court will not go behind nor disturb the compromises made by the executors, it follows that this must be regarded as a case in which there has been a deficiency of assets, and not as a case of *devastavit.* Any legatee that has been overpaid must, therefore, refund to the residuary estate any overplus that may be necessary to equalize the shares of all the legatees. The cases of *Stephenson* v. *Axson & Mitchell,* Bailey Eq., 276, and *Turbeville* v. *Flowers,* 27 S. C., 335, seem to be conclusive of the law upon this point in South Carolina.

The residuary estate now in the hands of the administratrix *de bonis non* as reported to me amounts in actual available assets to the value of $10,997.89. This is exclusive of the life estates and of the fund set apart for Mrs. Chupein's annuity. The papers marked 4, 5, 6, 7, 8, 9, 10, 11, show the payments that have been made from time to time to each of the residuary legatees, with interest on each payment calculated to June 1st,

1892. The paper marked 12 shows the scheme of equalization between the residuary legatees based upon the principles laid down in the case of *Turbeville* v. *Flowers, supra.* By the calculations therein made, it will be seen that Miss Jugnot has been largely overpaid, and that in order to equalize the others with her the following amounts must be paid them:

| | | |
|---|---:|---:|
| Estate Mrs. E. C. Downey | $5,466 | 82 |
| Mrs. Caroline McNulty | 3,488 | 95 |
| Estate Julius Trouche | 3,113 | 59 |
| Miss M. L. Buerhaus | 291 | 90 |
| Making a total of | $12,361 | 26 |
| Add balance due executors by restated account | 1,095 | 80 |
| | $13,457 | 06 |
| The remaining residuary estate being calculated as $10,997 89 | | |
| And allowing therefrom to cover costs and expenses of this cause, an estimated sum of 2,000 00 | | |
| Leaves net residuary assets | $8,997 | 89 |

To which each of the residuary legatees is entitled to one-sixth, or $1,497.66. Which amount being deducted from $9,133.92, the difference between Miss Jugnot's receipts and Mrs. Duval's receipts (the one next below her) as shown by paper 12, will make the amount to be refunded by Miss Jugnot $7,636.36. This amount of $7,636.36 should be refunded accordingly by Miss Jugnot, she receiving back, however, her proportion of any surplus which may remain after the actual costs shall have been paid.

This estimate cannot be made with entire exactness until the administratrix *de bonis non* shall have filed her account, showing what interest has accumulated in her hands upon said securities, and what payments have been made by her from said fund to the legatees or to any other persons. It has been urged before me in argument that the residuary estate should be paid into court, so that the assets may be realized, the real

estate sold, and the distribution made under the direction of the court, and I think that under the rule laid down by the Court of Appeals, in *Thomson* v. *Palmer*, 2 Rich. Eq., 36, this should be decreed by the court.

I, therefore, respectfully recommend that a decree be made directing the administratrix *de bonis non* to account before the master for the residuary estate in her hands, and to turn over to him the unadministered assets; that the real estate (premises No. 155 East Bay) be sold by the master under order of the court, and the net proceeds of sale, after the payment of the expenses of sale, be held, with the other assets, for the purpose of the distribution and division hereinbefore indicated and recommended; that Miss Julia Jugnot be decreed to pay into the master's hands the amount of $7,636.36, according to the statement hereinbefore made, and that the costs of this case be paid from the said residuary assets, and the amounts due the residuary legatees, other than Miss Jugnot, as set forth above, be paid them from the whole fund, and any surplus remaining be divided between the six residuary legatees. The property subject to the life estates will not be available for the purpose of distribution until the life estates shall fall in, and it has, therefore, been excluded from the present estimates. The testimony taken, and the documentary evidence produced, are filed with this report.

The master filed a supplemental report, as follows:

Since my report in this case, filed on 11th, it has come to my notice that in the body of the report the amount to be refunded by Miss Jugnot is incorrectly given. The true amount can be calculated from exhibit 12, but I would prefer also to amend the body of the report in this particular, as follows:

On the twelfth page, after showing net residuary assets $8,997.89, the report should proceed thus: In order to equalize by cutting Miss Jugnot down to the one below her, she is to refund $9,133.92. But to raise the others to the same level and pay the executors, will require $13,457.06, as stated in the report; that is, $4,323.13 more than the amount to be refunded by her. This $4,323.13 must, therefore, be taken from the

$8,997.89 above, leaving for distribution $4,674.76; of this sum
each residuary legatee is entitled to one-sixth, or $779.12, which
amount being deducted from $9,133.92, the difference between
Miss Jugnot's receipts and Mrs. Duval's receipts (the one next
below her), will make the amount to be refunded by Miss Jug-
not $8,354.80. This amount of $8,354.80 should, therefore, be
refunded by Miss Jugnot, instead of the amount of $7,636.36 as
heretofore reported. The report should then proceed in all
other respects as before. I beg leave, therefore, to submit this
supplemental report accordingly.

The Circuit decree, omitting the history of the case as given
by the master, was as follows:

Many references were held by the master extending over a
long period of time, and much testimony taken touching the
matter of administration by the executors of the will of Poin-
cignon. After a great deal of trouble, research, and pains-
taking, the executrix of Wilmot G. DeSaussure presented to
the master a stated account, covering the entire period of ad-
ministration of the said estate by the executors thereof from
beginning to end. Too much credit cannot be given her and
her worthy son for their patience, zeal, candor, earnestness,
and honesty of purpose, manifested by them in laying before
the master all the facts in connection with the said administra-
tion available from the records left, not only by Wilmot G.
DeSaussure, but also by Florence E. Downey and the other
executors. Difficulties almost insuperable seemed to present
themselves, from the fact that neither of the executors seem to
have kept any book of account, made no annual returns to the
Probate Court, and their transactions have to be brought to
light from check books, the stubs of checks, and written mem-
oranda of various descriptions, receipts, etc., found amongst the
mass of material belonging to the administrator of the estate.

The master, too, has performed a most laborious and credit-
able work in patiently striving to bring order out of confusion,
and to arrive at the real facts touching the matter of accounting
and to reach the ends of justice; this, too, amidst a litigation
participated in by a number of learned counsel, each represent-

ing his client with characteristic zeal and ability. The whole field of the law covering the duties of executors, the method of stating accounts, the rights of legatees, the liability to refund, the method of calculating interest, the law regarding commissions—all seem to be covered in the exhaustive arguments of the learned counsel engaged in this litigation.

The case came on to be heard before me at Charleston upon numerous exceptions to the able report of the learned master. I have given the case as careful consideration as I have been able to do amidst my arduous labor in the courts of the Second Circuit. The pleadings, the report, and the exceptions to the report, and all the arguments of the counsel, have been carefully examined and considered, and in announcing my conclusions, I shall do so as briefly as possible. The statement of the pleadings, of the facts, and of the points at issue, are all so clearly set forth in the report of the master as to render it unnecessary that I should attempt to repeat them here. I deem it sufficient to notice and pass upon the exceptions to the master's report, and thus as briefly as possible to announce my conclusions of law and findings of facts. The leading exceptions are those taken by the plaintiffs' counsel, and in passing upon them the real merits of the case will be decided. After careful reflection, and with much hesitation, I have been constrained to take in general a view of this case at variance with that taken by the learned master.

The first exception is as to the scope of the complaint. The master has held that it is substantially a bill to marshal and administer the remaining assets of the estate of Etienne Poincignon, and that the aid of the court is invoked to carry this into effect. In this view I cannot concur. There is no insolvency here. The aid of the court is not necessary to enable the plaintiff to distribute this estate, but it is only invoked to aid her in securing an accounting of the deceased executors, and of the legatees, for the amounts received by them respectively, so that she can know how to make discribution of the estate. It is not necessary, therefore, that the estate shall be taken out of her hands, but only that the aid asked shall be given, and the principles laid down as a guide to her in mak-

ing distribution. I hold, therefore, that this exception to the master's report is well taken.

The second exception is that the master erred in holding that the payments made to the residuary legatees were in the nature of advancements or advances. The evidence, I think, clearly shows that the amount turned over by the executors to the respective residuary legatees were payments, and must be so regarded. This exception is well taken.

The third exception is that the master erred in holding that it is competent for the court, in this case, to order a refunding by any residuary legatee who may have been overpaid. The contention is that the pleadings do not cover such a proceeding. I hold that the pleadings in this case are sufficient to authorize the court to render such a judgment as will settle all questions which may arise on the question of refunding. This exception is overruled.

The fourth exception is that the master finds that the account filed by the executors in the Probate Court, in November, 1894, which shows a balance against the executors of $5,299.31, ought to show a balance of only $1,089.21. I regret that I have not the judgment of the Probate Court before me, and the master, in his report, gives no particular reason for finding that that balance of $5,299.31 is error. It was stated, however, in argument, without contradiction, that the accounting had before that court by the executors in 1874, showed a balance against them of $5,299.31, and that this balance was affirmed by a regular judgment of the court, from which no appeal was taken. Ordinarily, the executors would be concluded by a decree of this kind, no appeal having been taken therefrom. And at this remote period that final account would not be permitted to be surcharged and falsified. But without the account before me, and without a knowledge of the facts, I am unable, intelligently, to pass upon this exception, but will say that the error, if palpable, should be corrected in the subsequent statement of the accounts of the executors. I am not, therefore, prepared to say that the master erred in finding the balance of $1,089.64, neither am I prepared to say that he was correct in so doing. It seems to me that in a matter of this

kind, intelligent counsel should be able to agree upon an adjustment without further contention. If they do not, this item of the account must be referred back to the master.

The fifth exception is that the master erred in not finding that Wilmot G. DeSaussure was also managing executor of the estate from the date of the death of the testator. I think this exception well taken. The weight of the testimony shows that he was, from time to time, with Mr. Downey, actively participating in the management of the estate, and was his constant legal adviser; that he had intimate knowledge of all the actings and doings of Downey, whose transactions passed under his supervision, both as executor and as attorney at law. There were four qualified executors residing in the same city. One of the executors was a residuary legatee; two were husbands of residuary legatees, and constantly receiving portions of the estate. It seems to me the mere fact that the management of the business was more actively conducted by one, does not of itself show that the others were not participating therein. There is no doubt in my mind from the testimony in this case that Florence E. Downey and Wilmot G. DeSaussure were the active executors up to the time Downey moved to New York, and Wilmot G. DeSaussure after that time. But during this time I see no reason to conclude that Trouche and Duval did not agree in all transactions of Mr. Downey and Mr. DeSaussure. The fifth exception is, therefore, sustained.

The sixth exception involves the question as to the correct method of vouching accounts. It seems that in this case, Mrs. DeSaussure, as executrix, filed her account sworn to, and the master held that this was to be taken as *prima facie* correct, without being vouched item by item; that the burden was cast upon those who took exception to any item of the account to specify their particular objections and affirmatively prove error, following the rule laid down in *Duncan* v. *Tobin*, Cheves Eq., 146. Such, in my opinion, is not the correct rule governing executors and administrators' vouching of their accounts, but, on the contrary, they are required to vouch their accounts item by item. If an item cannot be vouched by a receipt, it should be sustained by the next best competent evidence available,

and every item that cannot be thus sustained by sufficient testimony should be disallowed. It is the usual practice for these fiduciaries to begin with the inventory and appraisement and sales bill of the estate, and account for all the items thereof, cash, personal property, or choses in action. If any remains uncollected, it devolves upon the collector to adduce satisfactory reason for failure to collect. If the choses in action were originally good, the executors will be charged with the amount thereof, unless it can be shown that after the exercise of due diligence the same cannot be collected. This is the first step usual in executors accounting. I do not mean to say that they should be charged with the entire amount of the inventory and appraisement bill at the dates thereof, but in the course of administration this must be done as these assets are collected and paid out. The law on this subject is clearly set forth in the case of *Black* v. *Blakeley,* 2 McCord Ch., 1, and in other cases of later date. In the case under consideration, I do not sustain the specific objections to the character of the vouchers that were submitted, but hold that under the circumstances of this case all memoranda of receipts and disbursements made by the executors at the time of the several transactions in the shape of checks, stubs of checks, written memoranda in books, or even open loose sheets of paper, were properly received in evidence by the master, supplemented by other testimony of a secondary character. A reasonable degree of indulgence in this respect should be shown to Mrs. DeSaussure, who has shown so much commendable zeal in striving now to do what the executors should have done when living. By adhering to the most rigid rule of accounting after such a lapse of time, and after the death of all the executors, would unquestionably result in hardship and injustice. So far as the principle is concerned, the exception to the master's rule for vouching accounts is well taken, and the rule contended for by the plaintiff is the correct one. The application, however, of this rule should be as I have indicated.

The seventh exception is in effect that in equalization of payments made to the several legatees, the master should not have charged interest. This exception is well taken. The payments

were made to the legatees as payments, not as advances, advancements, or loans, each legatee receiving the payments regarded them as such, and treated them as such; they are not accountable for interest thereon. The rule in *Turbeville* v. *Flowers*, 27 S. C., 338, does not apply. That was a case of intestacy. Various distributees had made purchases at the sale of the intestate estate, and given their obligations therefor. Of course, in the final settlement, they were called upon to account for their purchases and interest thereon. But these legatees, whether residuary or specific, received as payment, in part or in whole as the case may be, only what they were justly entitled to. In this respect the master is overruled.

The eighth exception is to the effect that the master erred in holding that the executors had full power to make the compromises to which objection has been made, and I think the exception is well taken. The authority given in the will to the executors to compound for and compromise debts due to testator, does not relieve them from the exercise of sound judgment and discretion; but, on the contrary, the compromises are to be made, in the language of the testator, "upon the terms which, in their judgment, may be best for the interest of his estate." This judgment they could not exercise capriciously, but it must be exercised with an eye single to the best interests of the testator's estate. This is the qualification expressed by the testator himself, and the executors thereof must be held to such discretion as in the opinion of the court was, under the circumstances, for the best interest of the testator's estate. The compromise of the large bonds specified in the exception as the "Bishop Bonds," resulted in a clear loss to the estate of over $15,000, and the compromise of other bonds resulted in a loss of about $8,000, the entire loss upon compromised bonds aggregating over $25,000.

In order to justify this it devolved upon the executors to show, by the preponderance of testimony, that these compromises were for the best interest of the testator's estate, and would have been so considered by men of ordinary prudence and discretion in the management of their own affairs. The weight of the testimony, however, satisfies me that these bonds

were all well secured by mortgages on real estate, and that if the executors had used due diligence and prompt efforts through the court to collect these debts, nothing, or very little, would have been lost. No efforts of this kind seem to have been made. For seven years no interest was collected; there is no evidence of any effort to collect interest; no suits were instituted; no suits seem to have been threatened, and at the end of that time the executors, of their own accord, proposed to the holders of the bonds a compromise, resulting in the aforesaid serious loss. If they were justified in this course, the evidence has not been forthcoming to show it; but the compromises have been sustained by the master upon the ground that the power was given them in the will, and that, from the condition of the times, it is doubtful if more could have been realized. This is not a sufficient reason, and the executors must be held to an accountability for due diligence in their efforts to collect these debts, and for a sound discretion in the compromises thereof, having an eye single to the best interests of Poincignon's estate.

They had no authority to be generous at the expense of the legatees. These bonds could have been distributed to the legatees, or some of them. Nothing at that time was in the way of a distribution and settlement of the estate. They might have, and ought to have, obtained the consent of these adult legatees to so important a transaction, but they acted without doing so. The executors were not bound to continue the administration through a long series of years, and through a period of great delay in collecting the assets. It was their duty to execute the will; it was for that purpose they qualified, and yet fourteen years after all the debts and specific legacies had been paid, we find no steps taken by them, or any of them, to wind up the estate, which might have been done years ago. I cannot charge these executors with the intentional exercise of bad faith. They were men of high character, sterling integrity, honesty of purpose, of more than ordinary intelligence, and one of them a lawyer of superior attainments. This fact, instead of excusing them, instead of entitling them to a greater indulgence at the hands of the court, is strong reason why they should be held to a stricter accountability than executors of a different cast.

I think, therefore, that the exceptions taken to the compromises, which have been sanctioned by the master, are well taken, and that the executors living at the time of these compromises are chargeable with the full extent of the loss occasioned thereby. Failure to collect interest on these apparently good assets for the period of seven years, I hold was a *devastavit* for which all the executors living at that period are responsible. For the loss by compromise, after the lapse of seven years, I hold that the executors who were living at that time are guilty of a *devastavit.* This rule must be applied to all the bonds compromised, and to all upon which losses were sustained, as well the bishop bonds as the other bonds set forth in the exceptions. I can see nothing in the evidence to sustain executors in suffering loss upon any of the said securities. For the same reason the ninth exception is sustained.

The tenth exception is, that the master erred in finding that the item of $3,597.67, charged against Mrs. McNulty, as of the 25th of November, 1874, be stricken from both sides of the account. It was charged twice to her, and, hence, should have been stricken out only in one place, and not from both sides of the account. The tenth exception is, therefore, sustained.

The eleventh exception is, that the master erred in allowing the charge of $175, entered against Mrs. McNulty on the 1st November, 1881. There is no proof sufficient to sustain this charge, and the exception, therefore, is sustained.

The twelfth exception is, that the master erred in striking from the account items aggregating $1,776.16, and charged in the account as having been paid to Mrs. Downey, as guardian. The evidence clearly shows that these were paid on account of the residuary estate, and, therefore, must not be considered as coming from the Waverly House funds. They were paid to Mrs. Downey as part of the residuary estate by the executors, and they are presumed to have known best from what fund they came. This exception is, therefore, sustained.

The thirteenth exception is, that the master should have held that the Manning bond belonged to the residuary estate of E. Poincignon. The weight of the evidence, I think, is clearly against the finding of the master. The bond is conditioned to

pay $3,476.56 to "Wilmot G. DeSaussure, executor of the will of Poincignon." It is secured by a mortgage of real estate, and the mortgagee named is "Wilmot G. DeSaussure, executor of E. Poincignon." Had this bond and mortgage been intended for Julius Trouche, there is no reason why this intelligent executor should not have transferred it to him. This stamp of ownership must prevail unless there was evidence, clear and conclusive, that the bond really belonged to the estate of Julius Trouche. I don't think that the evidence sustained the master, however, and the exception is, therefore, sustained.

The fourteenth exception is, that the master erred in allowing commissions on the proceeds of the sale of the premises No. 285 King street, in excess of $6,746.33, that being the full amount of the proceeds handled by the executors. The transaction with Mrs. McNulty clearly shows that she merely purchased the equity of redemption. The price of the property agreed to be paid was $16,000. There was a mortgage on the property for $9,255.67. She assumed the payment of this mortgage, and then paid the executors the balance, so she really bought and paid for the equity of redemption. The executors only received $6,746.33 in the transaction, and are entitled to commissions only on that amount. This exception is well taken.

The fifteenth exception, in regard to the note of F. T. Downey, must be sustained. I see no evidence to sustain the conclusion that that note formed a part of the cash in the inventory and appraisement.

The sixteenth exception is overruled. I do not think that the executors should be deprived of commissions on certain sums of rent and interest collected through agents. The services of these agents were necessary, and the executors were justified in paying for said services, and are entitled to commissions for the money which, through these agents, came into their hands.

The seventeenth exception is sustained. The receipt of Mrs. McNulty, given to the executors, is for $3,000 in S. C. consol bonds. There is no testimony to justify the master in adding

thereto $405, for the supposed value of the coupons then due. The language of the receipt must cover the charge.

The eighteenth exception is well taken.    The executors must be charged with the note of E. H. Stelling for $300, the note of A. Loryea for $100, and the note of James Salvo, Jr., for $100. They have not shown any attempt, by due diligence, to collect these notes, and, without evidence of the insolvency, they are chargeable with the amount thereof.

The nineteenth exception is well taken.    The master erred in not holding that Julius Trouche committed a devastavit in common with his co-executors, and, therefore, the interest of the estate of Julius Trouche in the estate of E. Poincignon must be held responsible for such devastavit.    The amount of this devastavit during the lifetime of Julius Trouche can only be found by computing the amount of loss occasioned by the neglect to collect the interest on good choses in action, by the failure to collect rents, and by the failure to collect choses in action which are still on hand uncollected, and which, by proper diligence, could have been collected prior to the date of his death in 1877.

The twentieth exception seeks to charge the executors with failure to collect rent from the Edgerton & Richards property. The executors acquired title to this property on the 12th September, 1876, and are clearly chargeable with the rents which they actually realized from that property whilst in their possession, and for reasonable rent which might have been realized by due diligence; and the same rule must be applied in ascertaining the rentable value of all other real estate coming into their possession and under their control.

The twenty-first exception must be sustained.    The master should have found that the account must be stated with annual rests.    This he has not done.    Under the facts and circumstances of this case, during the long period of this administration large sums of money were collected by them year after year, and large payments were made year after year to the various residuary legatees.    I cannot see any reason, therefore, why the rule controlling the method of stating the accounts of executors and administrators should be departed from in this case.    The ex-

ecutors could have kept and ought to have kept books of account, in which they charged themselves in each year with all the cash received, and credited themselves with all the cash paid out. They could have made some, and should have made annual returns to the Probate Court. All this was neglected. No book has been discovered in which they charged themselves with the cash received; and in order to find out cash disbursements, the defendant executrix has been forced to revert to memoranda, checks, check books, stubs of checks, receipts, &c. So great neglect on the part of the executors should not excuse their representatives from accounting annually for receipts and disbursements.

The twenty-second exception is well taken. The executors should be charged with $80, for six months interest on $4,000 City of Charleston four per cent. bonds. The account shows that on the 25th of August, 1880, these bonds were acquired by the executors. Interest is payable on them semi-annually. On the 25th of January, 1881, these bonds were sold. There is no reason why the interest accrued up to that time should not be charged.

The twenty-third exception is that the master should have held that the executors are not entitled to any commissions on any balance they have turned over, or may turn over, to the administratrix *de bonis non*. This exception must be overruled. They are entitled to such commissions.

The twenty-fourth exception is that the master erred in finding a balance due executors. If the account is correct as herein contended for, there would be a balance against the executors due by them, with interest from date of the last entry in such account. Upon this exception I have only to say that I am satisfied that the restatement of the account upon the principles announced in this decree will show a balance against the executors.

The twenty-fifth exception is that the master should have found that this was a case of devastavit. According to the principles I have announced, the executors have been guilty of devastavit; to what extent will be ascertained on the restatement of the account. This exception is well taken.

31—41

The twenty-sixth exception is in substance that the master should have found that the estate of W. G. DeSaussure, and the interest of said estate in the fund in question as legatee of Julius Trouche, are liable for the alleged overpayment to Miss J. Jugnot and for devastavit in general. I have already announced that Julius Trouche was guilty of a devastavit during his lifetime; to the extent of this devastavit his interest in the estate of Poincignon will be liable in the first instance, and the only distribution, in fact, that can be made to the estate of Julius Trouche will be the excess of his share over and above the ascertained devastavit.

The twenty-seventh exception is, in substance, that the master, in calculating the extent of the alleged overpayment to Miss Jugnot, failed to consider the funds set apart for Mrs. F. J. Quinby and for Mrs. O. F. Chupein. These two funds, in round numbers, would be about ten to twelve thousand dollars, and both of them may fall in at any time. The exception is well taken on the method of accounting adopted by the master; but inasmuch as this decree greatly changes that method, and will result in a great difference in the final balance, the contention set up in this exception will scarcely arise, nor will that contended for in the twenty-eighth exception.

The twenty-ninth exception need not be considered, as it contains a sweeping charge of error in general.

I have thus reviewed the exceptions taken in behalf of the plaintiff, and in passing upon these I have practically passed upon all the exceptions by the counsel for the defendant parties. The master's report in every other respect is confirmed, save wherein it is hereby overruled.

It is ordered, adjudged, and decreed, that the cause be recommitted to the master, G. H. Sass, Esq., with instructions to restate the account upon the principles of this decree. The residuary estate of Etienne Poincignon will thus be found to consist of the assets already turned over to the plaintiff, with any that were turned over to Miss Buerhaus, the balance which will be found against the executors under the terms of this decree, and the payments which have already been made to the residuary legatees. These various amounts in the aggregate

will constitute the estate for distribution, less, of course, the costs and expenses of this action; and the distribution will be made by the administratrix *de bonis non*, under the direction of this court, so as to equalize each legatee; and it is so ordered.

This decree was filed December 1, 1892. On December 10, the following supplemental decree was filed:

It is further considered, ordered, adjudged, and decreed by this court, that while the pleadings in this cause are sufficient to authorize the court to render such a judgment as will settle all questions which may arise on the question of refunding, no refunding can be ordered from a legatee, if there was an original deficiency of assets to pay all the legatees a sum equal to the amount received by the one alleged to have been overpaid. That no refunding can be ordered where there has been devastavit on the part of the executors, who are primarily liable, producing a deficiency of assets. That the payment of a given amount by the executors to one legatee admits assets to pay all other legatees a like amount. That ordinarily a voluntary payment cannot be recovered, and as the executors had every means of knowing the exact condition of the estate when they made payments to the legatees, and were in possession of the books, papers, vouchers, moneys, deposits, and securities of the estate, the payments to Miss Jugnot cannot now be recovered from her, unless upon a restatement of the accounts upon the principles of my decree there should appear that there was an original deficiency of assets, in which event she will be ordered to refund the overpayment to her, but without interest.

This supplemental or explanatory decree is made at the request of Mr. Northrop, who informs me that some controversy exists as to the real meaning of my decree just filed, although I do not think there is any ambiguity in it.

EXCEPTIONS OF MRS. DESAUSSURE.--1. That his honor erred in not holding that the complaint herein was substantially a bill for the general winding up and administration of the estate of E. Poincignon, so that a final settlement might be made between all the parties to the suit. 2. That his honor should have held that all the parties to this proceeding, through their at-

torneys, had accepted and acquiesced in the view that this was a proceeding for the final settlement of the estate of E. Poincignon, and that all the testimony had been directed to that end, and that no one, at this stage of the cause, has a right to object thereto. 3. That his honor should have held that the amounts received by the residuary legatees were advances or advancements on account of their respective shares, and not payments. 4. That his honor should have found that the account filed in the Probate Court in November, 1874, showing a balance qf $5,299.31 due by the executors, was a mistake, and that it ought only to have shown a balance of $1,089.21 due by them. 5. That his honor should have found that F. T. Downey was the managing executor of the estate from the probate of the will to his departure from Charleston, in September, 1882, and Wilmot G. DeSaussure only became managing executor after that last date, and that Julius Trouche never had taken part in the active management of the estate. 6. That his honor should have found that the proper method of vouching an account before the master in a Court of Equity is that directed by the case of *Duncan* v. *Tobin,* Cheves Equity, 146; and should further have found, as a conclusion of fact, that vouchers were produced and offered for every item of the account submitted. 7. That his honor should have held that in the equalization of payments made by the several residuary legatees, the master was right in charging interest from the date of each payment. 8. That his honor should have held as a conclusion of law that under the power given in the will of Etienne Poincignon, his executor had the right to make any compromises dictated by their judgment, and that such compromises, when made, could only be attacked and disallowed on the ground of fraud or bad faith. That his honor should have found as a conclusion of fact that the compromises in the present case were made in the exercise of good faith and sound judgment by the executors, and should have sustained the same. 9 and 10. [Substantially the same as No. 8.] 11. That his honor should have found that F. T. Downey was the confidential agent and trusted attorney of the residuary legatees, Marie L. Buerhaus, Julia Jugnot, Caroline McNulty, and his wife, Elodie C. Downey, and

the guardian of her children. That as such agent and attorney, they devolved on him full power to act for them in all matters appertaining to the settlement of the estate of E. Poincignon. That the compromises in question were made by F. T. Downey as the active executor of such estate, and as the agent and attorney of the said residuary legatees, who are now estopped from contesting such compromises. 12. [Substantially the same as 11.] 13. That his honor erred in finding that the item of $3,579.64, charged against Mrs. McNulty as of 25th November, 1874, was charged twice against her, and should be stricken out only on one side of the account. But he should have sustained the master's finding that this item should be stricken from both sides of the account. 14. That his honor should have found that the master was right in allowing the charge of $175 against Mrs. McNulty, Miss Buerhaus, and Miss Jugnot, and Mrs. Duval, on the 1st November, 1881, in that the payment was made by their attorney, F. T. Downey, as a charge against their interests. 15. That his honor should have found that the Manning bond had been originally given for moneys loaned out of the residuary estate of E. Poincignon, and charged to the share of Julius Trouche therein, and were his property, and that the Manning bond, and the mortgage securing the same, constituted a part of the estate of Julius Trouche. 16. That his honor erred in overruling the master's allowance of commissions on the entire proceeds of the sale of the premises No. 285 King street, the place having been sold for one entire price, and the payment of the mortgage being only the method of the payment of a part. 17. That his honor should have found that the testimony clearly showed that the note of F. T. Downey was a part of and included in the aggregate of the cash returned in the inventory. 18. That his honor should have held that Mrs. McNulty, having received the $3,000 in S. C. consols bonds, with a large number of unpaid coupons thereon, which were collected and paid as cash, was chargeable with the same. 19. [Same as No. 18 in different form.] 20. That his honor erred in holding the executors chargeable with the notes of E. H. Stelling for $300, the note of A. Loryea for $100, and the note of James Salvo, jr., for

$100, in that there was no testimony showing that the same could have been collected, and the executors must be presumed under the power given in the will to have made proper effort to collect the same. 21. That his honor erred in holding that the estate of Julius Trouche must be held liable for any devastavit, whereas his honor should have held that Julius Trouche had never taken any part in the management of the estate during his life, and that no devastavit whatsoever had occurred prior to the death of Julius Trouche. 22. That his honor erred in holding that the executors were responsible for failure to collect rent from the Edgerton & Richards property. That his honor should have held that the executors are responsible only for rents actually received, unless it first be established that they had in their possession property actually producing rents which they fraudulently or negligently failed to collect. 23. That his honor erred in holding that the accounts should be stated with annual rests and interest thereon, without the qualification that the interest should be charged only upon such amount in the hands of the executors as were in excess of a proper amount to be kept on hand to meet the necessary and proper disbursements incurred in the management of so large an estate. 24. That his honor erred in holding that the executors should be charged with $80 for six months interest on $4,000 city of Charleston four per cent. bonds, due 1st January, 1881, it not being shown that the same was actually received by the executors, or that the bonds were not sold with the coupons attached. 25. That his honor erred in holding that this was a case of devastavit, or that any devastavit had been proved therein. 26. That his honor erred in holding that the interest of the estate of Julius Trouche in the residuary estate of E. Poincignon was responsible in this case for any balance found to be due by the estate of W. G. DeSaussure on a final accounting, whereas his honor should have held that the interest of the estate of Julius Trouche in the residuary estate of E. Poincignon should be paid to his personal representative, to be applied to the debts of Julius Trouche, before any residue could be applied to his legatee or such legatee's debts. 27. That his honor should have sustained the method of account-

ing adopted by the master, and should have overruled the exception to the master's calculating the overpayment to Miss Jugnot, without considering at this time the funds set apart for the life estate of Mrs. Quinby and Mrs. Chupein.    28. That his honor should have ordered the funds in the hands of the plaintiff paid into court for distribution, according to law, together with any other assets to arise out of the final accounting among the other parties to the cause.    29. [Same, substantially, as No. 28.]    30. [Substantially the same as No. 11.]    31. [Substantially the same as Nos. 3 and 7.]

The exceptions of G. M. Trenholm, as administrator, raised points raised by the exceptions, *supra*, except Nos. 1, 16, and 18, which were as follows: 1. Because his honor erred in not confirming the master's report in all respects.    16. Because his honor erred in holding that no refunding can be ordered from a legatee, if there was an original deficiency of assets, to all the legatees the sum equal to the amount received by any one alleged to have been overpaid.    18. Because his honor erred in holding that the amounts paid or advances made to Miss Jugnot cannot now be recovered, unless upon the restatement of accounts upon the principles of his decree there should appear that there was an original deficiency of assets.

The exception of Julia Jugnot are sufficiently stated in the opinion of this court.

*Messrs. Mitchell & Smith* and *H. A. DeSaussure*, for Mrs. DeSaussure, executrix and administratrix.

*Mr. R. G. Rhett*, for G. M. Trenholm, administrator.

*Mr. C. B. Northrop*, for Miss Jugnot.

*Mr. J. E. Burke*, for Mrs. Duval.

*Mr. R. G. O'Neale*, for the executors of Buerhaus.

*Mr. John F. Ficken*, for plaintiff.

July 27, 1894.    The opinion of the court was delivered by MR. CHIEF JUSTICE McIVER. In view of the fact that the

reports of the master, and the decree of the Circuit Judge, which should be incorporated in the report of this case, will furnish a sufficient statement of the facts of this somewhat complicated case, to enable us to determine the many questions raised by these appeals, we will not undertake to make any such statement here, but will content ourselves with a bare outline of the uncontested facts of the case, which will be sufficient to afford a general idea of the nature and objects of the action, the decree in which we are called upon to review.

The testator, Etienne Poincignon, having duly made and executed his last will and testament, departed this life some time in the year 1873. By his will the testator, after sundry devises and special legacies, gave all the residue of his estate to his nephew, Julius Trouche, and his nieces, Marie Louise Buerhaus, Julie Jugnot, Caroline McNulty, Elodie Downey, and Priscilla Duval, to be divided equally between them, and appointed as his executors W. G. DeSaussure, Julius Trouche, F. T. Downey, and Lawrence Duval. The will was duly admitted to probate on the 15th of July, 1873, and on the same day all the persons named as executors duly qualified as such. On the 25th of November, 1874, the executors, having paid all the debts of the testator and the special legacies, and having made provision for the life estates and annuities created by the will, filed their account or return with the Judge of Probate, which was duly allowed as properly vouched, which account showed a balance against the executors of $5,299.31. From that time forward no other account or return was filed by the executors, or either of them. The several executors have all died, one after the other, as follows: Trouche in 1877, Duval in 1878, Downey in 1883, and DeSaussure in February, 1886.

In January, 1888, the present action was commenced by Marie L. Buerhaus, who had taken out letters of administration *de bonis non*, with the will annexed, upon the estate of the testator, Poincignon, for the purpose of obtaining from the defendant, Martha G. DeSaussure, as executrix of the last will and testament of W. G. DeSaussure, the last surviving executor of Poincignon, an account of the assets of the estate of the said Poincignon, which came into his hands as executor as afore-

said; and that such of the residuary legatees as are now living, and the personal representatives of those who are dead, may account for the amounts received by them on account of their respective shares of the residue of the estate of the original testator, Poincignon, for which purpose they have been made parties defendant to the action. These parties all answered, concurring practically in the prayer of the complaint. All persons interested being before the court, an order was passed referring it to Master Sass, to hear and determine all the issues made by the pleadings, with leave to report any special matter. Master Sass held numerous references and took a mass of testimony set out in the "Case," and submitted his report, accompanied by exhibits, showing the state of the accounts, and the same, together with the exceptions thereto, came before his honor, Judge Hudson, who rendered his decree, differing widely from the master in many of the conclusions reached by him.

And the case has been brought here upon exceptions to Judge Hudson's decree, filed by the defendant, Martha G. DeSaussure, as executrix of W. G. DeSaussure, and as administratrix *de bonis non*, with the will annexed, of Julius Trouche; by G. M. Trenholm, as administrator *de bonis non*, with the will annexed, of Elodie C. Downey, and by Julie Jugnot, who was originally represented by the attorneys for the plaintiff, but who, when in the progress of the references it was found that her interests might conflict with those of the plaintiff, was subsequently represented by Mr. Northrop. It will not be necessary to set out these exceptions here, as they should be incorporated in the report of the case. Nor do we think it necessary, or even advisable, to consider the several exceptions *seriatim;* and we propose, therefore, to group the several exceptions into classes, as suggested by the subjects to which they relate.

We will first direct our attention to the exceptions filed by Mrs. Martha G. DeSaussure. The first and second exceptions attack the view taken by the Circuit Judge as to the scope and object of the action. It seems to us that the manifest purpose of this action was to ascertain what now con-

stitutes the residuary estate of the testator, Etienne Poincignon, which the plaintiff had undertaken to administer, and to effect this purpose it, of course, would be necessary to have an accounting from those originally entrusted with its administration, as well as an accounting from those entitled to share therein, of the amounts severally received by them respectively. To obtain such accounting was the aid of the court invoked, in order to enable the present representative of the residuary estate to ascertain what was due to each of those interested therein. It is not an action to marshal assets, or to enjoin creditors, or to sell realty in aid of personalty for the payment of debts, nor is the court asked to administer the fund under its direction by the proper officer for that purpose. The practice prescribed in the case of *Thomson* v. *Palmer*, 2 Rich. Eq., 32, has no application to a case like this. We agree, therefore, in the view taken by the Circuit Judge, and these exceptions must be overruled.

The third, seventh, and thirty-first exceptions relate to the mode of dealing with the amounts received by the several residuary legatees on account of their shares of the residue; and as these amounts were received at different times and in unequal sums, the main inquiry is, whether interest should be charged on the several amounts from the time when they were received. Inasmuch as it seems to be conceded that all the debts of the testator, as well as all special pecuniary legacies, had been paid before the account or return made by the executors on the 25th of November, 1874, was passed by the judge of probate, nothing remained in their hands except the residue, of which sum, except so much thereof as was necessary to provide for the life estates and the annuitants, each of the six residuary legatees was then entitled to demand and receive from the executors an equal share; for, of course, the sum appropriated to the life estates, and the raising the annuities, could not be divided amongst the residuary legatees until the life estates fell in and the annuities terminated. If, therefore, one or more of the residuary legatees received from the executors a sum or sums of money differing in amounts, and received at different times, not exceeding in the whole the share of the

fund then subject to division, they received their own money, and, of course, are not chargeable with interest thereon.

The apparent inequality resulting from this, whereby some of the residuary legatees have enjoyed the use of the whole or portions of their shares for a longer period than others, is not due to any fault of those who received their shares, or portions thereof, in advance of the others, and is no invasion of the rights of such others; for when the fund became subject to division, each one of the residuary legatees, who were then all *sui juris*, as the Circuit Judge finds, had a right to demand and receive their full shares, and if some received more than others it was not their fault, but rather the fault, or at least the misfortune, of the others, which was in no wise attributable to those who had received more. If, however, any one or more of the residuary legatees has received more than his or her equal share of the funds for division, then to the extent of such excess such legatee has received money not belonging to him or her, as the case may be, and is bound to refund the same, with interest, to the executors or persons representing them; or, in this case, where all the parties are before the court, to those who have been underpaid, in order to avoid circuity of action. Inasmuch, however, as under the view which we shall take of other exceptions, it is altogether improbable that any of the residuary legatees will be found to have been overpaid, we need not dwell further upon this subject. These exceptions to the extent *only* as indicated above should be sustained, and the Circuit decree be modified accordingly.

The fourth exception requires no consideration, for, as we understand it, the matter therein referred to has been referred back to the master for further investigation.

The fifth, fourteenth, fifteenth, seventeenth, and twentieth exceptions raise questions of fact, and, under the well settled rule, the conclusions reached by the Circuit Judge will not be disturbed, unless without any evidence to sustain them, or manifestly against the weight of the evidence, neither of which can properly be said in this instance. These exceptions are, therefore, overruled.

The sixth exception questions the ruling of the Circuit

Judge as to the proper method of vouching the account, and his omission to notice the fact that vouchers were offered for every item in the account. It does appear, at folio 314 of the "Case," that vouchers were offered, for at that point we find the following statement of what occurred at a reference held on 5th March, 1891: "The accounts of the executors of Poincignon before the Probate Court, as vouched before that court 25th November, 1874, are regarded as vouched in the master's office. Account from that date was taken up and vouchers were offered. The account was marked in evidence and submitted to counsel for examination." And further on in the "Case" it appears that after the account had been examined, counsel for parties demanding the account stated various objections to the account as presented, and these objections were considered in detail and passed upon by the master. It does not appear that the plaintiff ever demanded the production of a voucher for each item of the account; but, on the contrary, as we have seen, the vouchers were offered. It is true, that the present plaintiff, in her sixth exception to the master's report, does complain of the ruling of the master, that, as Mrs. DeSaussure filed a verified account, she was only required to prove those items of the account to which specific objection was made, and it was in passing upon that exception that the Circuit Judge made the ruling complained of in the sixth exception to his decree.

It seems to us that the ruling of the Circuit Judge as to the proper mode of vouching the account of an executor is correct, and is fully sustained by the case of *Black* v. *Blakeley*, 2 Mc-Cord Ch., 1, cited by him, as well as by the case of *Wright* v. *Wright*, 2 McCord Ch., 185. Indeed, we think that the case of *Duncan* v. *Tobin*, Cheves Eq., 143, relied on by the master, when properly understood, also supports the ruling of the Circuit Judge. Even in the passage quoted by the master from that case, it appears, clearly, that the production of a verified account by the accounting party does not dispense with the necessity for the production of vouchers to establish the disbursements claimed to have been made, as is shown by the concluding words of the passage quoted: "when that is

done [that is, when the amount with which the accounting party should be charged is ascertained in the mode prescribed], either by admission or proof, the accounting party must discharge himself by the production of receipts or other competent evidence." This is made still more apparent by the language used by Johnson, Ch., in another part of the same opinion, where, in speaking of the returns made by the executor to the ordinary, he says: "They are *prima facie* evidence as to the receipts, for he can produce no other than that furnished by the inventory, the bill of sales, and the amount of moneys received, which the opposite party would, of course, be entitled to surcharge and falsify. But not so with regard to the disbursements; that is susceptible of other proof, and must be established and vouched according to the general rules of evidence."

The misconception arises from confounding the two sides of the account. When an executor files a verified account, based upon his returns to the proper officer, in which he charges himself with the amount of the sale bill, for example, and with money collected on the choses in action belonging to his testator, *that side* of the account is to be taken as *prima facie* correct, subject, however, to attack by the party demanding the account, as incomplete or incorrect in certain specified particulars; but when he makes up the other side of the account, showing his disbursements, he must vouch each item by the production of receipts or other competent evidence of such disbursements. We agree, therefore, with the Circuit Judge in the view which he has taken; and we further agree with him that, after such a lapse of time, every reasonable indulgence should be extended to Mrs. DeSaussure in taking the account. See *Lewis* v. *Price*, 3 Rich. Eq., 172. The sixth exception must, therefore, be overruled.

The eighth, ninth, and tenth exceptions allege error in the Circuit Judge in holding the executors liable for the losses sustained by the compromise of certain bonds found by them amongst the assets left by the testator. It seems to us that the evidence sustains the Circuit Judge in holding that these bonds could all have been collected if the

executors had used the most ordinary diligence. The undisputed fact is that, so far, at least, as the larger portions of these bonds, designated in the case as the bishop bonds, are concerned, the executors held them for a period of about seven years, without collecting, or attempting to collect, any interest thereon, whereby the amount due thereon, at the time of the compromise, had been increased to a very large amount by the accumulation of interest; and then, at the instance of the executors themselves, and not at the instance of the debtors, the bonds were compromised at less than fifty cents on the dollar, thereby entailing a very heavy loss upon the estate of the testator. These bonds were secured by mortgages of real estate estimated by those supposed to be competent to make such estimates to be worth an amount sufficient to pay these bonds in full, even with the large accumulations of interest thereon. We look in vain for any testimony even tending to show that these compromises were wise or prudent business transactions, entered into with a view to protect the interests of the estate; and, on the contrary, all the testimony forces the conclusion that they were nothing but voluntary surrenders to the debtor, the Roman Catholic Church, of more than half of well secured debts. Such a transaction, however commendable in one dealing with his own property, can never receive the sanction of a Court of Equity when entered into by one entrusted with the protection and preservation of the property of others.

It is sought, however, to sustain these compromises by the large discretion conferred upon the executors by the terms of the will of their testator. The clause relied upon for this purpose reads as follows: "And I also empower them to compound for, compromise, and settle such debts as are due to me, upon the terms which, in their judgment, may be best for the interest of my estate." It is contended that this language conferred upon the executors unlimited discretion in the compromise of debts due to their testator, and that the exercise of such discretion is beyond the control of a Court of Equity, and the case of *Fronty* v. *Godard*, Bail. Eq., 509, is cited to sustain that view. In that case the testator gave all of his property in Charleston

to his wife for life, with remainder over to others, adding these words: "But I do, nevertheless, empower my said wife, by her last will and testament, or other instrument signifying her intention, to make some provision or portion to our orphan child, Augustine Matilda Emma Barton, whom I recommend to her good and generous heart." The wife, by her will, executed the power, by appointing to the daughter about two-thirds of the Charleston property, and one of the questions in the case was, whether the appointment was excessive. In delivering the opinion of the court, O'Neall, J., after quoting the language above set out, used this language: "The true question on this clause is, has the testator left the nature and amount of the provision to the discretion of his wife? If he has, then his confidence in her must be held to have authorized any disposition in favor of the complainant, be it much or little. For, after all that has been said and written on the subject of the execution of powers, the only principle which can be safely extracted from the cases is, that where a power of appointment is to be exercised according to the discretion of the person to whom it is committed, no appointment, however unjust or unreasonable it may seem, can be regarded as excessive; but where any limitation is placed to the exercise of his discretion, the courts will control the execution of the power." This case also establishes the principle recognized in numerous other cases, that in determining the extent of a power, the intention of the donor, in its creation, must constitute the guide.

Looking at the present case in the light of these principles, the inquiries are: 1st. Whether the power conferred was unlimited, and if not, what is the limitation? 2d. What was the intention of the testator in creating the power? We think it clear that the power conferred was not an unlimited power to compromise *any* debt due to the testator, for the obvious reason that the testator has not said so, and the language which he used cannot be regarded as implying any such intention. On the contrary, the language used necessarily implies that he intended to invest his executors with power to compromise *only* such debts as in their judgment it might be best for the interests of his estate to compromise—that is to say, in order to

avoid the loss of the whole, or a greater part, the executors
might safely compound for the less.   The discretion or power
was not, therefore, unlimited, but was restricted by a due re-
gard for the interests of the estate committed to their charge;
and, therefore, as laid down by O'Neall, J., *supra*, the court
will control the exercise of the power.   It cannot be said that
the testator intended to invest his executors with the unlimited
power to compromise any or all of the debts due him, and cer-
tainly did not intend that his executors should, under the guise
of this power, practically donate to a debtor about one-half of
a well secured debt.   If such had been his intention, it would
have been very easy and most natural for him to provide in
his will for the release of one-half or the whole of the debt of
the church to which he belonged.   On the contrary, he seems
to have collected regularly the interest on these church debts,
up to about the time of his death.

It is contended, however, that the simple fact that the execu-
tors made these compromises is sufficient to show that, in their
judgment, it was best for the interests of the estate to compro-
mise these debts, and that, in the absence of proof of fraud or
bad faith, they must be sanctioned.   We do not understand that
any one imputes fraud or bad faith to these executors, or either
of them, and we certainly make no such imputation.   But as-
suming, as we readily do, that there was no fraud or bad faith,
we cannot accept the view, that the mere fact that the compro-
mises were made is sufficient to show that such compromises
were, in the judgment of the executors, for the best interests
of the estate, especially in the absence of any evidence tending
to show that the interests of the estate were, in fact, promoted
by such compromises, and in view of the fact that such evidence
as has been introduced tends to show that the debts compro-
mised were well secured by mortgages of real estate.   Indeed,
it seems to us, from a review of all the facts relating to this
branch of the case, that the true view is, that the executors
misconceived the scope and extent of the power conferred upon
them, and supposing that they were invested with unlimited
discretion, undertook to make these compromises rather than
to enter into an unpleasant litigation with the church of which

their testator was a member, which would probably have resulted in a sale of portions of the church property, doubtless expecting that their action in the premises would be sanctioned and approved by those interested in the estate. We are of opinion, therefore, that these exceptions must be overruled.

The eleventh, twelfth, and thirtieth exceptions, practically, make the point that the residuary legatees there named are estopped by reason of the fact that F. T. Downey, one of the executors, was their trusted and confidential agent, and had full power to represent them in all matters pertaining to the settlement of the estate of Poincignon, and that the compromises made by him must be regarded as made by them. It does not seem to us that the evidence sustains the view that the judge should have found as therein claimed. Besides, it appears that when the compromise of the bishop bonds was consummated, Downey was in New York. The receipt is signed by Mr. DeSaussure alone, and in it he says: "The bonds will be delivered upon the return of Florence T. Downey, one of the executors, in whose custody they are."

The thirteenth exception, as to the item of $3,579.64 charged against Mrs. McNulty, seems to us to present a mere question of book-keeping; and as the account has to go back to the master, if there is any error in this charge it can then be rectified.

The sixteenth exception presents the question whether the executors should be allowed commissions on the whole amount of the price of the premises No. 285 King street, or only on the amount of the cash which passed through the hands of the executors. It seems that the executors sold this property to Mrs. McNulty, the price agreed upon being $16,000, but the property being, at the time, encumbered with a mortgage to secure a debt to a third person, amounting to something over $9,000, the arrangement was that Mrs. McNulty should satisfy this mortgage, which she did, and pay the balance of the purchase money, amounting to over $6,000, to the executors. This sum, therefore, was the only amount that passed through the hands of the executors, and upon that sum

alone are the executors entitled to commissions. This exception is consequently overruled.

The eighteenth and nineteenth exceptions are sustained. If Mrs. McNulty received $3,000 of State bonds, with unpaid coupons attached, amounting to $405, as the master finds and the evidence seems to show, we see no reason why she should not be charged and the executors credited with the amount of such coupons.

The twenty-first exception must be overruled. The evidence certainly shows that Julius Trouche did take a part in the management of the estate during his life, and, of course, he would be responsible for any devastavit committed before his death.

The twenty-second exception must be sustained. The simple fact that the executors had in their possession real estate of the testator, is not of itself sufficient to render the executors liable for the rents thereof, without some evidence tending to show that they might have let the premises and negligently failed to do so.

The twenty-third exception imputes error to the Circuit Judge in holding that the accounts should be stated with annual rests. This is clearly the general rule, provided care be taken to prevent compounding the interest where the payments in a given year do not amount to as much as the interest on the previous year's balance, which can be easily done by keeping a separate interest account, by carrying the interest forward in a separate column. With this explanation, this exception is overruled.

The twenty-fourth exception complains of the charge of six months interest on certain city bonds, due 1st January, 1881, which bonds were soon after sold by the executors. In the absence of any evidence tending to show that the bonds were sold with overdue coupons attached, we think the charge was correct, and the exception is overruled.

The twenty-fifth exception, besides being too general in its form, cannot be sustained by the evidence, as devastavit was clearly proved.

The twenty-sixth exception cannot be sustained. In the

absence of any evidence that there are any outstanding debts due by the estate of Julius Trouche, and in view of the evidence that Trouche did act as executor up to the time of his death, during which period there was a devastavit, by failing and neglecting to collect the interest on the largest debts due the testator, whereby great loss ensued to the estate, it is clear that neither he, if living, nor his personal representative since his death, would be entitled to receive anything as residuary legatee until such loss has been made good to the estate. This, as we understand it, was the extent of the Circuit Judge's ruling, and the exception is overruled.

The point raised by the twenty-seventh exception will probably lose any practical importance, inasmuch as it is highly probable, if not altogether certain, that when the account is reformed, as required by the decree in this cause, it will appear that none of the residuary legatees have been, in fact, overpaid; and hence it will be altogether a speculative inquiry as to whether there was any error in the mode adopted for ascertaining the amount of the alleged overpayment to Miss Jugnot. We may add, however, that we are not now prepared to admit that the funds set apart for the life estate of Mrs. Quinby, and to raise the annuity for Mrs. Chupein, should be taken into the account. These funds have never yet become subject to division amongst the residuary legatees, and it is possible that before the life estate and the annuity fall in, the funds set apart for this purpose may be wholly or partially lost, by some unforeseen cause for which neither the executors nor those who have succeeded to the management of the estate could be held responsible; in which event a serious question might arise as to whether these funds could properly be regarded as part of the residuary estate, subject to division amongst the residuary legatees. But we make no ruling now upon the subject, as we do not deem it necessary to do so.

The twenty-eighth and twenty-ninth exceptions have been practically disposed of by what has already been said.

Turning, then, to the exceptions filed by Mr. Trenholm, as administrator *de bonis non*, with the will annexed, of Mrs.

Downey, we find that the first exception is entirely too general to call for any consideration. All of the other exceptions have been practically disposed of by what we have said in considering the exceptions filed by Mrs. DeSaussure; though we should add that the sixteenth exception, as printed in the record, is based upon a misconception of what the Circuit Judge did, in fact, hold. He did not hold that no refunding could be ordered from a legatee, "if there was an original deficiency of assets," but just the contrary, as is recognized by the terms of the eighteenth exception. This apparent inconsistency is, doubtless, due to a misprint.

It remains only to dispose of the exceptions filed by Miss Jugnot. All of her exceptions, except the ninth, relate to the alleged overpayment to this lady, and to the mode of requiring her to refund, in case she has been, in fact, overpaid. But as it is quite manifest that when the account is reformed, as required by the decree, there will, in fact, be no overpayment to her, it would needlessly protract this opinion to consider these exceptions further than they have already been treated of. The ninth exception is in these words: "Because his honor erred in not holding that all proper parties are now before the court." This is evidently a misconception of his honor's decree, for, after stating the various changes occasioned by the death of some of the parties, and the appointment of personal representatives of such deceased parties, we find these words: "So that all persons interested in the final decree are now parties to the action." This exception must, therefore, be overruled.

The judgment of this court is, that the judgment of the Circuit Court, except as modified herein, be affirmed, and that the case be remanded to that court for the purpose of carrying out the views herein announced.

In this case, Mrs. DeSaussure, executrix, filed a petition for rehearing, upon the grounds that this court, in overruling her exceptions, numbered 5, 14, 15, 17, and 20, had overlooked the fact that the master had differed with the Circuit Judge as to all of these matters, and that this

court was in error in stating that the testator had regularly collected interest on the bishop bonds. On this petition, the Chief Justice and Mr. Justice Pope (Mr. Justice McGowan's term of office having expired), endorsed an order, September 14, 1894, in the same words as in *Anderson* v. *Pilgram, ante,* 440.[1]

---

1 There are a few other cases of November term, 1893, that were not decided in time to appear in this volume. They will be found in vol. 42.—REPORTER.